UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KONDA D.[1],                           )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     CIVIL NO.  3:18cv1018
                                       )
ANDREW M. SAUL,                        )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social

Security Act.  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the

[Commissioner] shall file a certified copy of the transcript of the record including the evidence

upon which the findings and decision complained of are based.  The court shall have the power

to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for SSI must establish an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since August 28, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, headaches, morbid obesity, bilateral epicondylitis status post-surgery on the left elbow, and history of diabetes mellitus (20 CFR 404.1520(c) and 416.920(c).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 41`6.967(a). The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. The claimant cannot crawl. The claimant can occasionally balance, stoop, crouch and kneel. The claimant cannot be exposed to moving, mechanical parts or unprotected heights. The claimant cannot be exposed to excessive vibrations. The claimant can occasionally reach above the shoulders, frequently reach down to waist level and occasionally reach down to the floor. The claimant can frequently handle objects with her hands and fingers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 21, 1975 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR apart 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2013, through the date of this decision (20 CFR 404.1520(g) and 4165.920(g)).

(Tr. 16-28)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff  filed her opening brief on June 4, 2019.  On August 13, 2019, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on September 10, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature

4

of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

On May 23, 2013, Plaintiff attended an initial evaluation with Dr. Christopher Sayers at Accelerated Rehabilitation Centers related to lateral epicondylitis. (R at p.355). Dr. Sayers noted that Plaintiff sustained an injury to her left epicondyle as a result of repetitive reaching and packing of products at work, the onset of symptoms occurred 4/22/13. *Id.* Dr. Sayers noted that Plaintiff was unable to do frequent gripping or pinching at this time. *Id.* He documented "decreased flexibility bilateral forearm, wrist, and hand muscles" during the physical examination. (R at p.356).

Plaintiff attended an appointment at South Bend Orthopedic on July 15, 2013. (R at p.343). This report indicated that Plaintiff had completed four to five sessions of physical therapy without much improvement. *Id.* She received a steroid injection in the left elbow, was prescribed a splint, and was referred to occupational therapy. (R at 343-344).

On September 7, 2013, Plaintiff's glucose level was reported as 221 with a normal range of 60-99. (R at p.493).

Plaintiff attended an appointment with Dr. Adelbert Mencias at South Bend Orthopedics on September 30, 2013. (R at p.337). It was noted that Plaintiff had been unable to work since her injury in April 2013. *Id.* Plaintiff received a cortisone injection in her right elbow, was referred to occupational therapy, and elbow compression sleeves were recommended. (R at p.338).

According to the progress report completed by Accelerated Rehabilitation Centers on October 11, 2013, Plaintiff had attended 20 appointments. (R at p.393). The assessment stated, "Patient appears to have plateaued in progress of her left arm." (R at p.394). Ongoing physical therapy was recommended. *Id.*

On December 3, 2013, Plaintiff attended an appointment with Dr. Mencias related to pain in her right elbow and weakness/pain in her forearm. (R at p.329). Dr. Mencias released Plaintiff back to work with the following modified duty restrictions, "right side limit lift/push/pull to 10-15lbs," "no overhead work," and "no use of the left arm." (R at p.330).

On January 10, 2014, Plaintiff attended a follow up visit with Dr. Mencias after undergoing surgery on her left elbow on 10/31/2013. (R at p.248). Plaintiff reported that Worker's Compensation stopped therapy on both arms. *Id*. Dr. Mencias provided diagnoses of lateral epicondylitis, osteoarthritis (DJD)- Elbow, he recommended occupational therapy. *Id.* Accelerated Rehabilitation Centers completed a functional progress note on January 31, 2014, which noted the following:

> This Functional Progress Note was performed and [Plaintiff] demonstrated the ability to perform 47.6% of the physical demands of her job as a Packer {in regard to her elbow diagnosis}. The return to work test items [Plaintiff] was unable to achieve successfully during this evaluation include: Occasional Shoulder lifting, Frequent shoulder lifting, Simple grasping and firm grasping. (R at p.436).

This report indicated that Plaintiff had reached her "maximum medical improvement" and it was recommended that she be discharged from physical therapy. *Id.*

Plaintiff received a steroid injection in her right elbow on February 7, 2014, from Dr. Mencias. (R at p.325).

On February 12, 2014, Dr. Mencias completed a return to work report with "permanent restrictions" to Plaintiff's right arm . (R at p. 256). Dr. Mencias documented that MMI had been reached and provided the following, "Ultimate PPI % right upper extremity, which equals 2% whole person." *Id*. This PPI was based on "mild persistent lateral epicondylitis." *Id*. Dr. Mencias provided the following restrictions on the right side "limit/push/pull to 5-10 lbs" and "no

outstretched arm use." *Id.*

Plaintiff received a lump sum of $2800 from Workman's Compensation on February 12, 2014 due to the permanent partial impairment. (R at p.255).

On March 7, 2014, Plaintiff attended an appointment with Dr. Scott Fielder regarding the pain in her elbows. (R at p.250). During the physical exam Dr. Fielder noted tenderness at the "ECRB origin" and pain with "wrist dorsiflexion." (R at p. 251). Dr. Fielder documented the following:

> Patient has been through a full course of conservative therapy for both elbows. This has included therapy, injections, cream, bracing and a left elbow procedure. Pain on left elbow has improved approximately 50%. A procedure has not been performed on the right elbow. Patient has been released from Worker's Compensation by her physician. However impairment rating was not given for left elbow. Furthermore given the fact that the left elbow procedure was to address her problem. Therefore it is my opinion that the patient should continue under Worker's Compensation to have her right elbow lateral epicondylar debridement and extensor tendon origin repair. Furthermore patient should be evaluated with regards to her left elbow impairment. (R at p.251-252).

During an appointment with Dr. Ted Achufusi on October 29, 2014, the following diagnoses were noted: bipolar, diabetes, hyperlipidemia, and migraine headache. (R at p.453). A lab report completed on December 6, 2014, noted a glucose level of 289 with a normal range of 60-99. (R at p.489).

On January 22, 2015, Plaintiff completed a physical examination at Pithadia Medical Professional Services as requested by DDB. (R at p.460). Plaintiff reported the following medications at this time: Atorvastatin, Depo-provera, Glimepiride, Lamictal, Losartan, Melatonin, Metformin, Victoza. *Id.* During the physical examination tenderness was noted in both elbows and "power in the hands revealed weakness bilaterally." (R at p.461). The following impressions

were provided: "patient has had epicondylitis requiring surgery and has epicondylitis in the other elbow," "patient now has psoriasis," and "absent reflexes in ankles bilaterally." ( R at p.462). The medical source statement indicated the following:

> 39-year-old female describes having diabetes. She does have obesity. With reflexes being hyperreflexic thyroid disorder should be explored. Patient is recognized to have psoriasis-psoriatic arthritis as a cause of her arthritis and tendinitis should be explored. *Id*

On February 16, 2015, Plaintiff participated in a psychological evaluation with Dr. Nancy Link at Link Psychological & Consulting Service as requested by the DDB. (R at p.465). During this evaluation Plaintiff expressed a depressed mood all day (nearly every day), loss in pleasurable activities, and suicidal ideation. (R at p. 466). She also expressed difficulty concentrating, focusing and multitasking. *Id*. Dr. Link provided the following diagnoses: "major depressive disorder, recurrent, moderate, with anxious distress," diabetes, chronic back pain, tennis elbow in both arms, and hypertension. (R at p.468). Dr. Link provided the following statement: "Based on the findings from this evaluation and the records supplied with the referral, [Plaintiff] is considered to be moderately impaired in terms of work related activities in respect to her overall signs and symptoms of depression and anxiety." *Id.*

A laboratory report dated April 4, 2015, indicated that Plaintiff's glucose level was 336, normal range listed as 60-99. ( R a p. 486).

On April 29, 2015, Dr. Achufusi, noted that Plaintiff's diabetes is "uncontrolled." ( R at p. 503). Plaintiff participated in a physical evaluation with Dr. Ralph Inabnit with The South Bend Clinic on August 3, 2015, as referred by the DDB. (R at p.514). Plaintiff reported a pain level of 8 on a 10 point scale in regards to her epicondylitis. *Id*. Dr. Inabnit noted the following:

> She has hypertension and hyperlipidemia. She has known diabetes mellitus type 2. She is non-insulin-dependent on an ADA meal plan, and was seen by a dietitian. Blood sugars run 120 to 140. *Id.*

The following medications were documented at the time of the evaluation: Metformin, Invokamet, Gabapentin, Lamictal, Losartan, Topamax, Lipitor, Lanus Insulin, Victoza. (R at p. 514-515). The following conclusions were made by Dr. Inabnit: bilateral chronic epicondylitis, weight gain, history of diabetes mellitus type 2, hypertension, hyperlipidemia, history of migraine headaches. (R at p.519).

Dr. Achufusi completed a Migraine Headache Assessment for Plaintiff on September 15, 2015. (R at p.524). Dr. Achufusi documented that he provided a prescription for Topamax to treat Plaintiff's daily migraines, these migraines have caused her to have difficulty with focusing, motion sickness, and vertigo. *Id.*

Plaintiff attended an appointment with Dr. Achufusi on October 16, 2015, and reported that the Depakote was not working, she believed it was making her migraines worse. (R at p.646).

Lumbar radiographs were completed on October 23, 2015, which demonstrated "multi level end plate osteophyte formation of the lower lumbar spine with mild degenerative disc and facet disease at L5-S1." (R at p.899).

On May 18, 2016, Plaintiff completed a eye exam at Community Health Center which revealed type two diabetes with diabetic cataract. (R at p.826).

On November 8, 2016, Dr. Achufusi completed a Medical Questionnaire on behalf of Plaintiff. (R at p. 830). Dr. Achufusi reported that Plaintiff's disability was expected to last at least a year. *Id.* He noted her disability prevented her from standing/sitting upright for six to eight hours due to chronic back pain, shoulder pain, joint stiffness, and diabetic neuropathy; she is

required to lie down during the day. *Id*. Dr. Achufusi noted that Plaintiff had difficulty ambulating

and had weight-bearing restrictions of less than five pounds. (R at p. 830-831). Plaintiff is

permitted to only occasionally reach above her shoulders and reach down towards the floor. *Id*.

Dr. Achufusi indicated that Plaintiff's disabilities affect her abilities to work/function normally

and that was suffering with chronic pain. (R at p.831).

Plaintiff attended an appointment with Dr. Sheel Patel at Centers for Pain Control on

January 11, 2017. (R at p.928). It was documented that Plaintiff had been suffering from pain for

the past 26 years due to a car accident that resulted in whiplash. *Id*. The report stated "the pain has

been progressively worsening with time and at this point, has become quite debilitating in nature.

It causes severe functional limitations." *Id.* Plaintiff described her pain as 10 out of 10 in the neck

and into the shoulders with numbness and tingling in bilateral hands. *Id*. She experienced

intermittent weakness and loss of control in bilateral hands. (R at p.929). Plaintiff has tried over

the counter medications and elbow injections, Norco has only provided mild to moderate relief.

*Id.* During the physical exam Dr. Patel stated "patient ambulates with difficulty and exhibits

guarding and antalgic behavior" and "exhibits moderate to severe pain with range of motion

maneuvers of cervical spine." (R at p.931). Dr. Patel noted the following diagnoses: cervical pain,

spondylosis, degenerative disc disease, pain in lumbar spine, and sciatica. *Id.*

A cervical spine MRI was completed on January 25, 2017, and provided the following

impressions:

> 1. At C5-6, there is a right paracentral disc protrusion. This causes mild flattening
> of the right side of the canal and cord. Central and right paracentral canal stenosis
> to about 8 or 9mm.
> 2. Milder disk desiccation and degenerative changes, but no significant bulging,
> canal, or neural foraminal stenosis at the other levels. (R at p. 938).

Plaintiff received a cervical medial branch block on March 31, 2017, at the Centers for Pain Control. (R at p.912).

On March 20, 2017, Plaintiff's BMI was documented as 44.2 by Maureen A. Panares DNP. (R at p.892). Furthermore, Plaintiff was diagnosed with diabetes type two, uncontrolled, with neuropathy. *Id*. A lab report that was completed on this date indicated that her glucose was 338, with a normal range of 74-109. (R at p.894).

On June 1, 2017, Plaintiff appeared for a hearing in Valparaiso, Indiana before ALJ Shane McGovern of the Valparaiso, Indiana Office of Disability Adjudication and Review (ODAR). (R. at 167-171) Claimant's attorney Gary Davis and vocational expert Sara Gibson also attended the hearing. *Id*. at 35

Plaintiff had struggled to bring herself to the hearing due to her depression and anxiety. (R. at 59) She explained, "I really wanted to stay in my bedroom and just not worry about anything. *Id*. She was "skittish" around people and more times than not isolated herself from the public. *Id*. Her depression and anxiety interfered with her social life. *Id*. Plaintiff used to go to church twice a week, but she had not attended church in over a year. *Id*. She even hid from her middle daughter when she came over. *Id*. To help combat her depression anxiety, Plaintiff took Lamictal, Bupropion and Wellbutrin. *Id*. at 59-60. Plaintiff sometimes forgot to take her medication which led to irritation, lashing out, among other things. *Id*. at 60-61.

Plaintiff last worked June 2016 as a newspaper deliverer. (R. at 42-43) She worked two hours, seven days a week. *Id*. at 45. However, she could not complete this job on her own. *Id.* at 42-43. Her kids assisted her on the paper route because her left hand lost feeling when she pushed out her left hand. *Id*. at 42. She would drop papers constantly. *Id.* She explained, "...my kids

either did it or helped me with it...there was always someone else doing all the manual labor...putting the papers in the boxes, running up to the house." *Id*. at 43-44. This job only lasted for a few months. *Id*. at 43. Previous job history ended in 2013. *Id*. at 45-50. It included employment boxing up parts, answering calls, and recruiting new employees. *Id*. at 45-50. However, the positions were all through temp services. *Id*. at 45-50.

Plaintiff believed the reason she couldn't work was because of her diabetes. (R. at 51) Her blood sugars fluctuated throughout the day such as wavering from 110 to 190. *Id*. This fluctuation occurred despite treatment with diabetic medications such as Lantus, Metformin, Glimepiride, and Invokana. *Id*. at 51-52. She felt fatigued throughout the day and experienced intermittent blurry vision. *Id*. at 56, 58.

The diabetes caused more damage than fluctuating blood sugars, blurriness, and fatigue. (R. at 52) She suffered neuropathy in her hands, arms, and feet. *Id*. at 52. A majority of the time the neuropathy took over, causing pain and numbness. *Id.* At one time, Plaintiff had burned her toe, but she hadn't realized until she actually saw the burn. *Id*. at 53. Plaintiff also had trigger finger on her right hand, causing difficulty in writing or holding things. *Id*. at 52. Furthermore, she struggled with recurring tennis elbow in both arms. *Id*. at 54. The left arm received surgical intervention, but the pain had reappeared recently. *Id*. She required surgery on her right arm. *Id*. at 54-55. The tennis elbows caused pain in both elbows, but her left arm experienced worse pain than the right arm. *Id*. at 55. She approximated she could hold and carry a gallon of milk, but that's not to say it wouldn't cause extreme pain. *Id*. at 62. Intermittently, she dealt with plantar fasciitis on her right foot, causing difficulty in standing and walking. *Id.* at 53. Plaintiff felt she could stay in position for five to ten minutes before she needed to move out of sheer pain. *Id*. at

61. Other than diabetes as a major factor in her ability work, Plaintiff suffered migraines and had suffered them for many years. *Id*. at 57

Plaintiff sought relief in medications and physical therapy. (R. at 53-54) Physical therapy worked for "the most part" as it helped her relax and loosen her muscles. *Id*. at 53. Pain medications such as Lyrica and Norco helped her through plantar fasciitis and nerve pain. *Id*. at 54. She used Meloxicam for the arthritic pains. *Id*. Her doctors had recommended weight loss to improved symptoms; however, weight loss didn't come easy for Plaintiff. *Id*. at 56. She took part in a low-carb diet but still struggled with her weight. *Id*. For her migraines, Plaintiff had received multiple injections, a nerve block to the back of her neck, and a prescription for Fioricet. *Id*. at 57. The next procedure she would receive for her migraines would be a burning to her nerves ends. *Id*. However, despite these extreme measures, Plaintiff's migraines had only been reduced in frequency and not cured completely. *Id*. When she took her Fioricet, it caused her drowsiness to the point she needed to sleep. *Id*.

Her treatments only took the edge off since she still struggled with daily living. (R. at 62) Plaintiff couldn't sleep at night, and when she got up from bed in the morning, she tried to keep some form of normalcy in her life. *Id*. at 62-63. However, this was a constant battle for her. *Id*. at 63. Chores such as laundry, dishes, and cooking needed to be broken up in time. *Id*. When she did the dishes, it would cause pressure on her back and her hands would become numb. *Id*. Plaintiff avoided washing glass things as she would drop and break them. *Id*. She needed help bringing laundry down the stairs, and moving wet laundry to the dryer pulled on her arms too much. *Id.* at 63-64. Plaintiff even struggled with her favorite hobby: cooking. *Id*. at 64. Cooking caused too much stress on her arms. *Id.* She explained, "...I have broke many handles on pans and scalded

myself. I have many scars from it because I have no feeling." *Id.*

The hearing concluded with the questioning of the vocational expert Ms. Gibson. (R. at 66) Ms. Gibson classified Plaintiff's past work as a hand packager, switchboard operator, and routing clerk. *Id.* at 67.

The administrative law judge posed hypothetical situations regarding an individual of the same age, education, and work experience. (R. at 68) The first hypothetical situation stated,

> "...could perform sedentary work...no ladders, ropes or scaffolds....no crawling, but...occasional with ramps and stairs. Balance, stoop, crouch, and kneel....no exposure to moving mechanical parts or exposure to unprotected heights....no exposure to excessive vibrations...some manipulative limitations....this may be a little different than what's in the doc, but if we...add...could reach up above the shoulders on occasional basis, could reach down to waist level on a frequent basis, could reach down towards the floor on an occasional basis and can handle objects with hands and fingers on a frequent basis " *Id.*

The only past relevant work available would be the switchboard operator. *Id.* at 69.

The second hypothetical built upon the first hypothetical: "...no more than simple, routine and repetitive tasks...take out positions involving tandem tasks or teamwork or production step....no interaction with the public, but can handle up to occasional interaction with coworkers and supervisors." *Id.* at 71. This situation would allow for the aforementioned positions to still be available. *Id.* However, if a restriction of lifting no more than five pounds would be put into effect, it would eliminate all the aforementioned jobs. *Id.* Counsel mentioned Plaintiff's migraines and how they kept her unable to do anything for a couple of hours. *Id.* Ms. Gibson compared this to off-task work, and therefore, the need to rest for a couple of hours would not allow for any kind of employment. *Id.* Outside of normal breaks and lunch, even twenty to thirty minutes of lying down would preclude anyone from work. *Id.* at 73. The jobs would also be eliminated if the

individual needed to isolate themselves from coworkers and required to work in light and noise sensitive settings. *Id*. at 72.

In support of remand, Plaintiff first argues that the ALJ committed reversible error at Step Five when he relied on vocational testimony which departed from the Dictionary of Occupational Titles. Plaintiff claims that the ALJ erred in failing to provide any evidentiary support or explanation for adopting the vocational expert's testimony that Plaintiff could perform three jobs with a residual functional capacity inconsistent with their definitions within the Dictionary of Occupational Titles, the publication on which Social Security relies in determining the individual requirements of particular jobs. R. at 27-28; SSR 0-04p; *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2003); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *See also Consol. Coal Co. v. Stein*, 294 F.3d 885, 893 (7th Cir. 2002) (parties to an administrative proceeding must satisfy the ALJ that their experts are qualified). A vocational expert is "free to give a bottom line," but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the vocational expert's opinions. *Donahue*, 279 F.3d at 446. "This Court has repeatedly noted that if a vocational expert's testimony appears to conflict with the DOT, the ALJ 'must obtain "a reasonable explanation for the apparent conflict."' And that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so.*" Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (per curiam) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000)). While the burden of proof is on Plaintiff during steps one through four, at step five the burden shifts to the Commissioner requiring he demonstrate a claimant can perform a significant number of jobs in

the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An ALJ can accept conflicting testimony if the vocational expert's experience and knowledge in a given situation exceeds that of the DOT's authors, or when the [vocational expert]'s contrary testimony is based on information in other reliable publications." *Id*. Here, the ALJ made no inquiry whatsoever into determining whether the vocational expert's "experience and knowledge" exceeded that of the DOT's authors. He merely accepted it and deemed it "consistent with the Dictionary of Occupational Titles" within his decision.

"If the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Id*. SSR 00-4p places the burden of evaluating whether a vocational witness's testimony is consistent with the Dictionary of Occupational Titles (DOT) on the ALJ. *Prochaska v. Barnhart*, 454 F.3d 731, 735-736 (7th Cir. 2006) (noting that SSR 00-4p was promulgated after the hearing in Donahue). "The inadequacy of vocational expert testimony has been remarked in a number of decisions by this and other courts, and by informed commentators." *Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014). Remand is appropriate when an ALJ leaves an "unresolved potential inconsistency in the evidence that should have been resolved." *Id*. at 736 (citations omitted).

Here, at Step Five, the ALJ found Plaintiff capable of performing only three jobs, all of which he and the vocational expert admitted the Dictionary of Occupational Titles defines as requiring "frequent" reaching (or up to 2/3 of an eight-hour workday) in all directions, during the hearing. R. at 74; SSR 83-10. The ALJ's residual functional capacity assessment only allowed for occasional (or up to 1/3 of an eight-hour workday) reaching above the shoulders; occasional

reaching down to the floor; and frequent reaching down to waste level. (R. at 20) In other words, such limitations allowed for less than "frequent" reaching in all directions. In concluding Plaintiff could perform three jobs which the Dictionary of Occupational Titles defines as requiring "frequent" as opposed to "occasional" reaching in all directions, the ALJ wholly relied on the vocational expert's testimony that this was possible. Despite acknowledging at the end of the hearing that this testimony was, in fact, inconsistent with the Dictionary of Occupational Titles, the ALJ concluded in his decision that the expert testimony at issue was consistent with the D.O.T.

The difficulty with the ALJ's reliance on the vocational witness's testimony is that, as they both admitted during the hearing, it was not consistent with the D.O.T. The Selective Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("S.C.O") defines each of the jobs the ALJ concluded Plaintiff could perform require "frequent" reaching in all directions: Inspector (D.O.T. # 669.687-014); Packer (D.O.T. # 737.587-010); and Assembler (D.O.T. # 739.687-066). While the ALJ may base his decision on vocational testimony which departs from the Dictionary of Occupational Titles, this Court recently re-affirmed that he must elicit and rely upon a reasonable explanation for doing so in order to bear his Step Five evidentiary burden. *Butler v. Berryhill*, No. 1:18cv59, 2019 U.S. Dist. LEXIS 17863 (N.D. Ind. Feb. 4, 2019); citing *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (per curiam) (quoting SSR 00-4p) No such explanation was given within the ALJ's decision, here, despite the fact he and the vocational expert agreed during the administrative hearing that the testimony in question was not based on the D.O.T. but the vague "expertise" of the vocational expert. (R. at 74) The Seventh Circuit has

continually rejected such vague bases for departure from the Dictionary of Occupational Titles as a means to demonstrate superior knowledge to its authors. *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016); *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (per curiam); *Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014). Consequently, the ALJ committed two errors which led to his failure to bear his evidentiary burden at Step Five: 1) he based his Step Five conclusion that Plaintiff could perform a significant number of jobs in the national economy on vocational testimony which was inconsistent with the dictionary of occupational titles without eliciting any good explanation for doing so; and 2) because he mistakenly deemed the testimony consistent with the D.O.T. in his decision, he likewise failed to offer any evidentiary basis to support a de facto conclusion the vocational expert's knowledge of the subject was superior to that of the authors of the Dictionary of Occupational Titles.

The ALJ's reliance on testimony which departs from both the D.O.T in concluding Plaintiff could perform a significant number of jobs significantly harmed Plaintiff in that the ALJ's limiting her to less than "frequent" reaching would have resulted in a finding of disability had the vocational expert's testimony been consistent with the D.O.T. The ALJ's failure to provide any evidentiary basis to support the vocational expert's departure from the D.O.T. renders his reliance on that testimony insufficient with regard to bearing his evidentiary burden of demonstrating Plaintiff could perform a significant number of jobs in the national economy. Remand is necessary so the ALJ may comply with the Dictionary of Occupational Titles or demonstrate some evidentiary basis to explain why the vocational expert is better qualified to opine on the question than that publication's authors.

The Commissioner concedes the ALJ did not make any attempt to garner some minimal

explanation from the vocational expert with regard to her providing testimony, which the ALJ admitted at the hearing was not consistent with the D.O.T. definitions of the jobs he found Plaintiff capable of performing. Nor does the Commissioner contest the fact it was the ALJ's evidentiary burden at Step Five of the decision to prove Plaintiff could perform a significant number of jobs in the national economy.

The Commissioner attempts to put the blame for the ALJ's error and failure to bear his evidentiary burden on Plaintiff's previous counsel, because he did not object to the vocational expert's testimony or demand that the testifying witness provide some substantiation for her deviation from the Dictionary of Occupational Titles. However, the Commissioner fails to recognize that counsel's failure to do so does not relieve the ALJ of his duty to provide some substantive explanation which explains why the vocational expert's testimony is more reliable than the D.O.T.'s definitions. "[A] claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so." *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (per curiam) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000)). The Commissioner puts forward nothing to distinguish the instant case from the aforementioned precedent. Consequently, remand is necessary so the ALJ may elicit testimony consistent with the D.O.T. or get a reasonable explanation for the departure and articulate its persuasiveness as part of his decision.

Next, Plaintiff argues that the ALJ's erroneous evaluation of the opinion evidence is not supported by substantial evidence. Plaintiff contends that the ALJ failed to provide any logical and accurate, let alone "good" reason, for declining to afford the well-supported and disabling opinion of Plaintiff's long-time treating physician "controlling weight." The Social Security

Administration gives substantial deference to the opinions of treating physicians. Indeed, a treating doctor's opinion must be given controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir.2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir.2010). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Scott v. Astrue*, 647 F.3d at 739; *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d at 306. Even if an ALJ does not give a treating physician's opinion controlling weight, the regulations still require him to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir, 2006); *Scott v. Astrue*, 647 F.3d at 740; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir.2009) (citing 20 C.F.R. § 404.1527(d) (2)). No such consideration took place in this case.

The ALJ elected not to assign controlling weight to Dr. Achufusi's opinion that Plaintiff could never lift more than five pounds, without providing any particular rationale with regard to his dismissal of that specific limitation, and despite the fact it appeared to be corroborated by therapists who administered Plaintiff a functional capacity exam. (R. at 25, 325, 436-437). Social Security's regulations provide that the opinion of a treating source, like Dr. Achufusi, should be granted "controlling weight" unless that opinion is "inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). The ALJ provide no rationale, let alone a logical and accurate one, which explained why the opinion that Plaintiff could only lift up to five pounds was inconsistent with the other substantial evidence in the record. The ALJ failed to

provide a single piece of evidence which contradicted such a limitation. Nor did he confront the fact other examiners who conducted a functional capacity examination for purposes of determining workers compensation corroborated the opinion, or the multitude of clinical findings which add further support to Dr. Achufusi's opinion: decreased/painful range of motion in the upper extremities (R. at 460-464, 920, 925, 929); diminished strength in the upper extremities (R. 329, 460-464, 929); diminished reflexes of the bilateral upper extremities (R. at 519), diminished reflexes of bilateral lower extremities (R. at 519); sensation loss in the bilateral upper extremities (R. at 329, 928); positive straight leg testing bilaterally (R. at 925, 931); guarded ambulation (R. at 920). The ALJ's failure to articulate evidentiary support for his conclusion that Dr. Achufusi's opinion was inconsistent with the record fails to provide this Court the "logical and accurate" bridge it requires to engage in meaningful review of such a conclusion.

Moreover, despite the support for Dr. Achufusi's opinion, the ALJ arbitrarily departed from that limitation and, at the same time, wholly relied upon Dr. Achufusi's opinion regarding Plaintiff's upper extremities which the vocational expert had testified were non-disabling. (R. at 25, 69-70). In his post-hearing decision, the ALJ stated he relied on the non-disabling limitations put forward by Dr. Achufusi, despite departing from the disabling ones, because the limitations the vocational expert testified were non-disabling were "consistent with the evidence of the claimant's bilateral epicondylitis status post-surgery on the left elbow." (R. at 25). This rationale is deficient for two reasons: 1) the vast majority of the supportive clinical findings involving Plaintiff's upper extremities came after her surgery in 2014; and 2) an MRI (R. at 938) demonstrating disc protrusion which flattened the nerve canal and spinal cord were demonstrative of the notion her upper extremity impairments were not solely caused by her elbow epicondylitis.

Clearly, the ALJ's illogical picking and choosing of the opinions issued by Dr. Achufusi suggest such conclusions were influenced by a desired outcome rather than a thorough evaluation of the evidence. It, therefore, further illustrates the lack of logical and accurate, let alone "good" reason for his departure from Dr. Achufusi's opinion that Plaintiff could never lift more than five pounds.

Even if this Court were to find the ALJ's decision not to confer controlling weight to Dr. Achufusi's opinion was appropriate, the ALJ erroneously discounted its well-supported conclusions without engaging in proper analysis under his agency's own rules and regulations. If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In *Larson v. Astrue*, the Seventh Circuit reversed an ALJ decision because, while the ALJ expressly articulated a good reason for not giving a treating source opinion controlling weight, "the ALJ said nothing regarding [the] required checklist of factors." 615 F.3d 744, 650-651 (7th Cir. 2010). Here, the ALJ granted the treating psychiatrist's opinion "little weight" without mentioning a single one of the aforementioned factors in deciding how much weight to assign the opinion. The ALJ granted no weight to the fact that Dr. Achufusi treated Plaintiff as her primary care physician for more than two years before issuing his opinion. Nor did he mention the frequency witch which Dr. Achufusi examined Plaintiff (multiple times per year between 2014 and 2016). R. at 444-459, 526-816. Finally, the ALJ made no attempt whatsoever to explain whether Dr. Achufusi's opinion that Plaintiff could lift no more than five pounds was consistent

with the record. He certainly made no attempt to specifically articulate evidence which might undermine or support such a conclusion. Consequently, any consideration of the "consistency" factor is unsupported by substantial evidence. Because the ALJ "said nothing regarding [the] required checklist of factors" as it related to Dr. Achufusi, remand is required. *Larson*, 615 F.3d at 650-651.

The Commissioner's arguments in response are lacking in logic and violate the *Chenery* Doctrine. The Commissioner first relies on the fact that the ALJ cited some negative clinical findings throughout the decision as evidence he provided "good reason" in his decision not to afford Plaintiff's treating physician "controlling weight." However, the ALJ was also required to construct a logical and accurate bridge between the evidence, negative and positive objective clinical findings, and his conclusion that the treating physician's opinion was unworthy of "controlling weight." Moreover, the Commissioner alludes to rationales which the ALJ did not rely on in dismissing Plaintiff's lift and carry restrictions on the basis she testified she could lift and carry a gallon of milk. This is a post-hoc rationale in violation of the *Chenery* Doctrine. Also, it is not logically based. While Plaintiff may have testified to the most she could lift and carry for a short distance. She certainly did not testify to what she could lift and carry on an occasional (1/3 of an eight-hour workday) or frequent (2/3 of an eight-hour workday) basis. Plaintiff is also not a doctor. What she could carry and what she should carry from a medical standpoint are two different questions.  As the ALJ's analysis as to what weight to give to Dr. Achufusi's opinion is erroneous, remand is required.

Next, Plaintiff argues that the ALJ erred in failing to consult a medical expert with regard to whether Plaintiff's combined impairments were medically equivalent to listing 1.04(a) after

MRI evidence which indicated threshold etiology was entered into the record. Plaintiff points out that no medical expert, not even the state agency physicians, ever considered whether Plaintiff's combined impairments medically equaled listing 1.04(a). (R. at 119). Moreover, the ALJ admitted those physicians never reviewed a substantial portion of the evidence, including a 2017 MRI of Plaintiff's cervical spine which indicated 1.04(a)'s threshold criteria of spinal cord compromise. (R. at 938) The Seventh Circuit has held that, "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." Citing 20 C.F.R. § 404.1526(b) ("Medical equivalence must be based on medical findings .... We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence."); S.S.R. 96-6P at 3 ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."), reinstating S.S.R. 83-19. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); citing *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir.1989) (concluding that ALJ complied with requirement of Social Security Ruling 83-19 that he consider a consulting physician's opinion regarding medical equivalency).

Here, the state agency physicians explicitly named the listings of presumptive disability they considered when they reviewed Plaintiff's case and listing 1.04(a) was not among them. (R. at 119). Nor were they ever able to review underlying etiology or threshold MRI evidence which would have triggered their consideration of the listing. (R. at 938). At the time the state agency physicians assessed Plaintiff's medical records, the limited evidence in the file only resulted in

their assessment of two medically determinable impairments: non-severe major joint dysfunction and non-severe affective disorders, both of which were wholly unrelated to Listing 1.04(a). (R. at 118). These facts strongly suggest the agency consultants were totally unaware of Plaintiff's cervical spine impairments and, therefore, did not consider whether her condition either met or medically equaled Listing 1.04(a). Had the ALJ reviewed their consideration of the evidence closely or even attempted any meaningful evaluation of Listing 1.04(a) himself, he may have detected the need for a medical expert to consider whether Plaintiff's combined impairments were medically equivalent to 1.04(a). Instead, the ALJ erroneously concluded that Plaintiff's combined impairments did not medically equal listing 1.04(a) despite the fact she exhibited every single one of its criteria within the relevant period: C-spine MRI demonstrate flattening of the canal and spinal cord at c5-c6 (R. at 938); pain which radiated into the extremities (R. at 250, 329, 468, 514, 928); limited range of motion of the lumbar and cervical spine (R. at 461-464, 920, 925, 931); loss of sensation (R. at 329, 928), absent and diminished reflexes (R. at 462, 519); and bilateral positive straight leg raise (R. at 925, 931)

The fact that the vast majority of 1.04(a) criteria exhibited by Plaintiff, including threshold medical imaging indicating spinal cord compromise, was never evaluated by the state agency physicians should have triggered the ALJ's subjecting that evidence to medical expert scrutiny. The Seventh Circuit recently held that evidence of listing criteria not previously demonstrated in the administrative record at the time of state agency review required the ALJ to submit complex medical imaging demonstrating 1.04(a)'s threshold etiology to medical expert scrutiny with regard to the question of whether that claimant medically equaled Listing 1.04(a). *McHenry v. Berryhill*, 911 F.3d 866, 871-872 (7th Cir. 2018). In the present case, however, no medical expert

ever considered the question of medical equivalence to listing 1.04(a) even though Plaintiff exhibited each of its criteria. Consequently, remand is required so a medical expert may opine with regard to whether Plaintiff's combined impairments are medically equivalent to listing 1.04(a).

In response, the Commissioner contends that it is only medical imaging demonstrating "nerve root compression" which is necessary to invoke consideration of listing 1.04(a). However, Listing 1.04 makes clear that it is either "compromise of a nerve root or the spinal cord" which serves as the threshold evidence for consideration of listing 1.04(a). As the Commissioner concedes, a portion of Plaintiff's cervical spinal cord was "flattened" by a bulging disc and she exhibited every one of the criteria required to meet the listing. Plaintiff logically argues that a "flattening" of the cord combined with exhibition of all the clinical criteria which characterize "compromise of the cord" or nerve root, suggest the threshold criteria of "compromise" of the spinal cord or nerve roots.

The Commissioner makes the same mistake as the ALJ in considering Plaintiff's MRI: he interprets it's severity and makes his own determination with regard to what impact it would or would not have had on agency medical experts' opinion of Plaintiff's potential meeting or medically equaling listing 1.04, or her overall limitations contained within the RFC. Plaintiff's MRI demonstrates compromise of the cervical spine, a threshold criteria which did not exist at the time the state agency physicians opined on her record. The Commissioner's argument that the MRI findings were not significant enough to re-submit the MRI to medical expert scrutiny displays the same impermissible medical judgments the ALJ used in making such an omission. The only difference is that the ALJ did not provide any explanation for that decision,

impermissible or otherwise. Moreover, the Commissioner's defense of the ALJ's decision provides this Court no distinction between the instant case and *McHenry v. Berryhill*, or any of the line of cases which conclude ALJ's should not interpret complex medical imaging, "an ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments. *McHenry v. Berryhill*, 911 F.3d 866, 871-872 (7th Cir. 2018); citing *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018). Clearly, remand is necessary so the ALJ may subject Plaintiff's most recent MRI demonstrating spinal cord compromise to medical expert scrutiny.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Entered: October 21, 2019.

s/ William C. Lee
William C. Lee, Judge
United States District Court